UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

SCOTT A. BARBOUR,         )
                              )
                              )
v.                             )      Criminal  No. 01-92-P-H
                              )      Civil No. 06-165-P-H
                              )
UNITED STATES OF AMERICA,  )
                              )
                              )

## RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION

Scott A. Barbour, sentenced by this Court to 420 months in prison on two drug counts, has filed a 28 U.S.C. § 2255 motion listing fourteen ineffective assistance grounds and adding a fifteenth ground asserting that he is actually, factually, and legally innocent of the cocaine conspiracy count. In addition to his lengthy 28 U.S.C. § 2255 memorandum, Barbour has filed a supplemental brief relying upon what he describes as newly discovered evidence concerning prosecutorial misconduct, "the gun incident," and "the cocaine incident." This newly discovered evidence is dependent on a recently executed affidavit of Barbour's co-defendant Barry May. The United States has filed a motion seeking summary dismissal. I recommend that the Court deny Barbour 28 U.S.C. § 2255 relief.

### *DISCUSSION*

### *Standards Applicable to the Review of Barbour's Habeas Grounds*

Barbour is entitled to  28 U.S.C. § 2255 relief only if his "sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum

authorized by law, or is otherwise subject to collateral attack" 28 U.S.C. § 2255 ¶ 1.

With respect to this Court's review of Barbour's § 2255 claims, summary dismissal is

appropriate if his motion: "'(1) is inadequate on its face, or (2) although facially adequate,

is conclusively refuted as to the alleged facts by the files and records of the case.'" <u>United

States v. DiCarlo</u>, 575 F.2d 952, 954 (1978)(quoting <u>Moran v. Hogan</u>, 494 F.2d 1220,

1222 (1st Cir.1974)). "Thus, the petition is subject to dismissal, without an evidentiary

hearing, if the grounds for relief either are not cognizable under section 2255 or amount

to mere 'bald' assertions without sufficiently particular and supportive allegations of fact."

<u>Barrett v. United States</u>, 965 F.2d 1184, 1186 (1st Cir. 1992) (citing <u>Moran</u>, 494 F.2d at

1222).

     The rule of thumb is that Sixth Amendment ineffective assistance claims are

properly saved for airing in a 28 U.S.C. § 2255 proceeding.  With respect to such

challenges the First Circuit has explained:

> The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." It is well settled that this right to effective assistance of counsel attaches at all critical stages of the trial, <u>United States v. Wade</u>, 388 U.S. 218 (1967), including at sentencing. <u>Gardner v. Florida</u>, 430 U.S. 349, 358 (1977) (holding that "sentencing is a critical stage of the criminal proceeding at which [defendant] is entitled to the effective assistance of counsel").
>
> The touchstone for any ineffective assistance of counsel claim is the two-part test laid down by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668(1984).
>
> > First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687. In other words, defendant "must show that counsel's performance was so deficient that it prejudiced his defense." United States v. Ademaj, 170 F.3d 58, 64 (1st Cir.1999) (summarizing Strickland ). As the Strickland Court explained, "[u]nless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Strickland, 466 U.S. at 687.

United States v. Colon-Torres, 382 F.3d 76, 85 -86 (1st Cir. 2004).

A proposition significant to numerous of Barbour's grounds is the rule that this Court can draw on its own first-hand knowledge of counsels' performance at the trial and sentencing in weighing the merits of his claims.  See United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993).

### Brief Factual Background

The 28 U.S.C. § 2255 movant, Scott Barbour, was charged with two conspiracies: one involving 500 grams or more of cocaine and the other involving 50 kilograms or more of marijuana. The conspiracy involved shipment of drugs and cash between Texas and Maine, using false names, mailbox drops, and ever-changing cell-phone numbers. There were many individuals implicated in the conspiracy.  Those that make repeat textual appearances in the following discussion are Barry May, Kevin Woodward, Steven Case, Shawn Stephen Hall, John Ross, and Pat "Donny the Monster" Cambron.  Jonathan Toof was the prosecutor for the United States; his name appears several times in the discussion below.

## THE FIFTEEN GROUNDS IN BARBOUR'S 28 U.S.C. § 2255 MEMORANDUM

### Evidence of Barbour's Use of the Alias Kugler (Ground I)

In his first 28 U.S.C.§ 2255 ground Barbour states that in October of 1999 he "absconded his federal supervised release" and moved with his family to Houston, Texas,

3

assuming the identity of Jon[1] Kugler.  (Am. Sec. 2255 Mot. at 12.)  Barbour explains that

he assumed this identity in an effort to evade law enforcement efforts apropos his

violation of the terms of his supervised release.  (Id. at 12-13.)

      With regards to his position that he is entitled to habeas relief, Barbour cites to an

exchange during this Court's trial management conference during which the prosecutor

expressed concern that the jury might draw the wrong inference if they were told that

Barbour had assumed the Kugler identity, in that the jury might conclude that he had

assumed this identity to cover his drug deals rather than to flee supervised release.  (Trial

Management Tr. at 42, Crim. No. 01-92-P-H, Docket No. 85.)[2]  Barbour emphasizes that

during the trial management conference both the Court and defense counsel expressed

confusion over why the prosecutor was raising this issue in that the prosecution would

likely benefit from the drug-dealer inference.

      There is, of course, a necessary context to understanding the exchange excerpted

by Barbour.  At the trial management conference, counsel and the court addressed a slew

of motions in limine filed on behalf of Barbour.  (See Docket Nos. 22-29.)  The

discussion Barbour highlights concerned "Defense Motion In Limine # 4" in which

Barbour moved,

> to exclude any evidence offered by the Government regarding any
> circumstance of the defendant's criminal status, including but not limited
> to, the existence and any evidence relating to any criminal convictions,
> any incarcerations, any placement in halfway houses, any placement on
> supervised release or probation, any violations of prison or halfway house
> rules, any violations of the terms of supervised release or probation, and

---

[1]     It is not clear whether or not Barbour used the name "John" or "Jon" or both– his pleadings use
both spellings.  The First Circuit Court of Appeal used "Jon" and I follow suit, unless "John" appears as
part of a quotation.

[2]     The docket entry demonstrating the date of this conference is January 23, 2002.  Barbour correctly
notes that the transcript itself appears to contain a typographical error, dating the hearing on January 28,
2002, which is the date that the trial commenced.

any arrest because such evidence is prohibited by Rules 402, 403 and 404
of the Federal Rules of Evidence.

(Mot. Limine # 4 at 1, Crim. No. 01-92-P-H, Docket No. 25.)

The pertinent exchange at the management conference -- when taken as a whole --

is not as mystifying apropos the performance of defense counsel as Barbour's out-take

suggests. After a discussion of Rule 404(b) concerns relative to other evidence, the Court

inquired whether that discussion addressed the issue raised in the fourth motion in limine.

(Trial Management Tr. at 39.) The prosecutor responded that this was not the case:

> This is really another issue, and I discussed this with [defense counsel], in
> 1999, when the conspiracy begins, the defendant was on supervised
> release with [a probation officer] in Portland.
> ….
>           The reason the defendant was on supervised release was that in
> 1996, he was convicted in Houston, Texas, District Court … of
> telemarketing fraud. He received a sentence of 18 months, and I think
> three years of supervised release.
>           When he got out of prison in Texas, he eventually … came to
> Maine and was placed under [the probation officer's] care and custody.
>           He then, to make a long story short, he fled Maine at the end of
> October of 1999 when he was assigned to the Pharos House for 90 days
> because he violated his supervised release, and he was unwilling to
> comply with the conditions there. So he fled the Pharos House and fled
> Maine with his family, went down to Houston, Texas.
>           In the beginning of 2000, he just continued sending drugs up to
> Maine, but from the Houston end rather than being on the Maine end. But
> he also changed his name, his identity, and got a driver's license in Texas,
> the name of Jon Kugler.
> ….
> … [A]nd he lived under that name for the next eight or nine months.
> Everything he did in Texas in furtherance of the conspiracy was done in
> the name of Jon Kugler. Opening a mail drop, several mail drops, bank
> accounts in which he laundered drug money, rented vehicles, maintained a
> cell phone, I mean, he was Jon Kugler, but it was Scott Barbour, okay,
>           The marshals in Texas were looking for him because he was
> wanted in Maine for violating his supervised release. They knew he was
> also dealing drugs, so they kind of joined the team. Several of them will
> testify at trial.
>           In August of 2000, Barbour/Kugler correctly concludes that the
> marshals are all set to close in on him, and he flees the state, goes up to

5

New Hampshire in North Conway, rents a house up there under the name Jon Kugler.

En route, he meets with Barry May and picks up $32,000 in drug proceeds, okay. And the court should understand that throughout this entire period of time, he's continuing to be part of the conspiracy as Jon Kugler.

Once he gets to North Conway, he senses that the marshals are closing in on him there, so he steals another identity, the identity of his landlord, a guy named Joseph Sullivan, flees North Conway, and goes back down the east coast and is finally arrested on that original supervised release revocation warrant in Tampa, Florida.

In October of 2000, when the marshals arrest him, they seize a wealth of documentation showing his false identification and showing that under that false name, Jon Kugler and/or …Joseph Sullivan, he continued to deal drugs. And some of those documents we intend to introduce at trial.

And that whole stage is set by his conviction from Florida in '96, and his flight from supervised release in '99. If we don't establish the reason he fled Maine, okay, and the reason he obtained the Jon Kugler identification, it strikes me and the government that the jury, the jury has to hear that he got the name Jon Kugler, and the only reasonable conclusion I think they can draw is that he's a drug dealer and the reason he left Maine was because they're after him for dealing drugs.

(Id. at 39-41.)

The following exchange then took place:

**The Court**:   I'm confused about one thing, if I understand the motion, I'll hear from [defense counsel] on this in a moment, the motion doesn't want me to let in convictions and incarcerations, halfway house placement, supervised release, violation of rules and then it says arrests.

Most of what you've told me doesn't address any of those, in other words, you can establish the false identity, you can establish the movements, you can establish all of those without referring to the fact that he's on supervised release for a different crime. Correct?

**Prosecutor**:   That's correct. I think that the problem is that it gives the jury the wrong story. It gives – the clear inference is that he changes his identification because he's a drug dealer, it sets the wrong stage I guess is the best way to explain.

**The Court**:   I'm not sure I understand it, you're saying it's the wrong inference to draw he's a drug dealer changing his name.

**Prosecutor**:   That's right. I think the correct inference is that he changes his name because the federal government is looking to execute the warrant for fleeing supervised release in Maine.

**The Court**:   Not because he is a drug dealer.

6

**Prosecutor**:   Right.  He dealt drugs in Houston, Texas for a long time under the name Scott Barbour.

**The Court**:   I'm still confused, if the defense wants it kept out, and you think by keeping it out the inference is helpful to the government on a drug distribution charge, why are you resisting it?  I think I'm missing something.

**Prosecutor**:   Maybe you are.

**Defense Counsel**:   Maybe I am.

**Prosecutor**:   Well, as I guess my concern is that somehow my evidence … of the charged offense would be limited because I'm foreclosed from introducing evidence that came to our attention because for example, the Deputy U.S. Marshals were investigating him as part of the fugitive case, As long as – I mean we all understand that the Deputy U.S. Marshals involved in this investigation, made observations and gathered information that helped our case, it doesn't matter to me whether or not the jury understands why they're looking at this guy.

**The Court**:  If they're fact witnesses and can properly testify with an adequate foundation about non hearsay information, I don't currently understand motion four as addressed to that.  I understand motion four as addressed to the fact that he was on supervised release or fleeing custody or whatever it might be, not the observations that law enforcement made.

**Prosecutor**:  All right.

**Defense Counsel**:   That's correct.

(Id. at 41-43.)

        When placed in full context  -- rather than focusing on the fragment cited by

Barbour – defense counsel's approach to the issue of the alias is not reproachable.   In his

28 U.S.C. § 2255 memorandum Barbour insists that he pressed his attorney to move to

exclude the evidence of the alias itself as identity theft is a crime excludable under

Federal Rule of Evidence 404(b).[3]  However, there is no question that the Kugler alias

was interwoven with Barbour's participation in the drug conspiracy and that it was a

---

[3]        Subsection (b) of the rule provides:
        (**b**) **Other Crimes, Wrongs, or Acts.**--Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.
Fed. R. Evid. 404(b).

necessary, admissible facet of the government's case with respect to testimony of witnesses and other non-testimonial evidence.  For defense counsel it was never a matter of excluding any reference to the alias; the concern was to limit the jury's exposure to Barbour's criminal status. Contrary to Barbour's assertion, the prosecution's explanation to the court did not provide the basis for a motion to exclude all evidence of the alias.[4] The evidence interlinked with the alias was relevant pursuant to Federal Rule of Evidence 404(b) because it showed Barbour's identity, intent to join the conspiracies, and efforts to avoid detection.  See United States v. Washington, 434 F.3d 7, 12 (1st Cir. 2006).

### Failure to Investigate (Ground II)

In explaining his second ground, Barbour writes that Stephen Shane Hall and Steven Case were the only government witnesses who claimed that Barbour was involved in distributing cocaine.  (Am. Sec. 2255 Mem. at 15 & n.3.)  He faults counsel for failing to investigate and failing to prepare in order to attack their testimony.

---

[4]     Barbour points to the prosecutor's closing argument which highlighted the change in name. The prosecutor stated:

> In order to run his operation, he changed his identity, ladies and gentlemen. Under the name Jon Kugler let me just show you one thing that occurred.  This is the Lori Jean Bailey Western Union to Jon Kugler.  Okay.
>
> He received money under that name. Why, why, because it's drug money.  Pat Cambron had Lori Jean Bailey send this to the defendant.  I want you to notice one thing. Well, two things.  This is Barbour, Kugler's driver's license number, and how does he sign this, what does he sign this as, sale manager.  He was a sales manager, all right.  He was responsible for selling a lot of dope, a lot of dope.
>
> If you look at the – there are other Western Unions you'll have a chance to look at, but I only have a couple of minutes, so I want to draw your attention to one series of transactions made by Scott Barbour—or excuse me, Jon Kugler, by using his – the cell phone that he had, of the cell phone that he had down in Texas.

(Trial Tr. (Vol. IV) at 761-62.)  The prosecutor then detailed some of the calls Barbour made on that phone that were related to the Maine drug conspiracy.  (Id. at 762.)  Barbour argues now that the prosecutor knew that his statement concerning the reason for assuming the Kugler identity was "untrue" adding "but, hey who can blame him for capitalizing on the glorious windfall generated by defense counsel's bevue?"  (Am. Sec. 2255 Mem. at 14-15.)

**Stephen Shane Hall**

With respect to Stephen Shane Hall, Barbour asserts that Hall testified that Hall was involved in the shipment of two ounces of cocaine to Maine and also participated in the "rerocking" of an additional amount of cocaine.  (Am. Sec. 2255 Mem. at 15.) Barbour faults his attorney for not being prepared to demonstrate to the jury that Hall "left Barbour's organization as much as six weeks prior to any cocaine shipments arriving in Maine."  (Id. at 16.)  Barbour claims that his attorney should have reviewed the grand jury testimony of Hall and the (unspecified) documentary evidence which would have disclosed that Hall left the organization between April 1, 2000, and May 1, 2000, whereas the other witnesses agreed that the first cocaine shipment to arrive in Maine was around May 15, 2000.  (Id. at 23-24 & n. 4.)  Had counsel garnered this information, Barbour argues, he could have impeached Hall vis-à-vis Hall's claim that he was involved with two shipments of cocaine with Barbour and, thereby, demonstrate Barbour's innocence of the cocaine count.  (Id. at 17.)  Citing his own affidavit, Barbour alleges that, when pressed by Barbour on this topic, his attorney told him that he "didn't really review that stuff closely."  (Id.; Barbour Aff. at 1.)

The United States points to the testimony of Hall at Barbour's trial concerning the cocaine importation into Maine.  (Gov't Mot. Summ. Dismissal at 7.)  The referenced testimony is as follows:

> Q.  Sometime around the first part of May, did the group of you become involved in shipping cocaine in addition to marijuana up to Maine?
> A.    I think it was more or less just a trial run, just because of the cocaine prices here in Maine are extremely high compared to Houston, Texas.
> Q.    Way to make some money?
> A.    Yes.

Q.      So how did your group go about obtaining cocaine and how do you get it up here to Maine?

A.      The first couple of times, I think Donny had scored some cocaine, and then it was packaged along with the marijuana and sent with the marijuana.

Q.      Sent in the same boxes?

A.      Yes, sir.

Q.      Let me show you what we've marked here and introduced as Government's Exhibit 47, do you recognize this as a big brown box; right?

A.      Right.

Q.      Would the cocaine and the marijuana be packaged in this same box or somehow different?

A.      No, it would be put the same, same way.

…

Q.      Okay.  At first you mentioned a couple of shipments, how much cocaine did you start off shipping up to Maine?

A.      The first time was just a small amount, a couple of ounces.  Then I can only think of maybe three occasions where I personally was involved in sending cocaine.

Q.      Were you involved in the first one, the couple of ounces?

A.      Yes sir, I was.

Q.      All right.  What happened, what about the next one?

A.      Second time that Donny had brought some cocaine over, and I myself helped Mr. Barbour rerock the cocaine before it was mailed here.

….

Q.      How much cocaine did Donny bring over on this occasion?

A.      Somewhere around something like 20 ounces, and then we put, I don't know, four or five ounces of inositol in.

Q.      Okay.  When the time finally comes to ship this to Maine, approximately how much cocaine do you have?

A.      About 26.

….

Q.      With regard to the cocaine … did you tell us that you were involved three times in sending cocaine up here?

A.      Yes, sir.

….

Q.      In terms of being able to meet the supply of marijuana or cocaine that was coming up here to Maine, did you and the remainder of the group, Barbour in particular, have any trouble with suppliers filling the demand in order to send drugs up to Maine, either with respect to marijuana or cocaine?

A.      Well, were we having trouble keeping enough of it, is that what you're asking me?

Q.      Right.

A.      From time to time, I mean, if it's not – if it wasn't good enough, we couldn't buy because you just get stuck with it.  But for the most part, we would find what we needed.

….

Q.      Okay.  Let's talk for a little bit about the Maine end of the operation, when you were sending the cocaine out, do you recall who you sent it to?

A.   At first I didn't know where it was going to.  Then after a while, from phone conversations and so forth, I found out that it was going to a guy named Barry here in Maine.

Q.      Who did you have these phone conversations with?

A.      Mostly it was from listening to Scott talk to him.  Then later on, I spoke to Barry myself a couple of times….

(Trial Tr. Vol. IV at 629-31, 634-35.)

The United States also points to the trial testimony of co-defendant Barry May.

(Gov't Mot. Summ. Dismissal at 7.)  As to the cocaine, May was questioned as follows

during Barbour's trial:

Q.      Focus on the cocaine, what do you know about that cocaine?

A.      That it was sent up from Texas.

Q.      Okay.  If the search warrant happened on May 16, how much before that time had that cocaine come up here from Texas?

A.      Three or four days maybe.

Q.      Did the cocaine come to you?

A.      Yes.

Q.      How much was it?

A.      A kilo.

….

Q.      Were you expecting it?

A.      Not really, no.

Q.      Well, when did you find out it was coming?

A.      The night before, and then I went there, and it – I could tell what it was when I got there.

Q.      How did you find out it was coming?

A.      Through Scott or Shane, they were all involved with it back then, but it was one of those guys, yeah.

Q.      What did they say to you?

A.      I was just told to go to that – go to that place that I normally went and picked up stuff at which would have been Grove Street.  I went there, and that's what ended up coming the next day.  Steve Case was there.  Turned around – I was kind of mad about it.  Turned around and gave it to Steve, went to Kevin Woodward's house, it was broken up and distributed.

11

Q.      Slow down.  Why were you upset that a kilo of cocaine had
showed up?
A.      Because … I went to rehab for it in 1990.
Q.      You had a problem with cocaine?
A.      In '80 and '90, yes.
Q.      Up until that point in your dealings with Barbour and his people in
Texas, had you had any – had you had any involvement with cocaine
distribution?
A.      No.
Q.      Was it all marijuana?
A.      Yes.
Q.      All of a sudden, a few days before May 16, this kilo shows up?
A.      Yes.
Q.      Did you expect the kilo of cocaine?
A.      No.
Q.      Took you by surprise?
….
A.      …[Y]es, it did.  It had been thrown through the air, you know, I
just wasn't  -- was against the stuff because I knew if it was to get in my
possession, being an addict, I would use.
Q.      Was it a full kilo?
A.      As far as I knew, yeah.

(Trial Tr. Vol. I at 99-100.)  May testified that the cocaine related activity around the

month of May triggered his decision to leave the cocaine and marijuana conspiracy.  (Id.

at 115-17.)

Hall testified that he and Barbour participated in the shipments and Barbour has

provided no evidence that that was not the case.  This Court does not have access to the

grand jury testimony of Hall that allegedly indicates he left the conspiracy before the

shipments and Barbour has not provided any of the alleged documentary evidence that

proves this proposition.  Based on my review of this testimony and the evidence at trial as

a whole, it is apparent that it would have been a legitimate tactical decision for counsel to

forego any serious inquiry into the precise dates of Hall's involvement in the cocaine

shipments to Maine.  See Strickland, 466 U.S. at 689 ("[A] court must indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional

assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" )(quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).[5]

### Steven Case

With regards to Steven Case, Barbour believes that his attorney should have investigated the 1993 burglary, robbery, and kidnapping convictions of Case. (Am. Sec 2255 Mem. at 18.) Barbour alleges that Case kidnapped the father of someone who owed

---

[5]      In his supplemental brief Barbour argues that he has newly discovered evidence in the form of May's December 2006 affidavit in which he equivocates on the question of Barbour's responsibility for sending the cocaine to Maine. In the affidavit May states:

> I have carefully reviewed my trial testimony concerning the cocaine, and I believe it is accurate with one exception. In my testimony, I said I was told to go to Grove Street (the drug drop site) by either Scott or Shane. This was inaccurate. Patrick Cambron had called me the night before and said, "Hey, I am sending something to Steve tomorrow but I don't want him to pull no shit saying he didn't get it, so can you go down there and make sure he gets it?" I thought this was a little strange for two reasons: first, even though Pat worked for Scott, Scott usually called me himself when a shipment of marijuana was coming. Second, the marijuana never went straight to the customer; it always went through me or one of my workers first.
>
>      The next day I went to Grove Street. Steve showed up right after I did. A little while later FedEx showed up and delivered the box. As soon as I saw the box I knew what it was, and I was furious. I had gone to rehab for cocaine addiction and I wanted nothing to do with it. ….
>
>      Once the cocaine was broken up at Kevin [Woodward's] house, Kevin said he wanted half of it, so Steve said he'd give Kevin half and he'd keep half, but I said I wanted some because it came to my drop site. Therefore, Steve kept 18 ounces, gave Kevin I think 11 ounces, and I got about 6 ounces.
>
>      That night I went home and got high and then called Scott. I told him, "thanks a lot for sending cocaine," and that I used after more than ten years of being clean. I now remember Scott's response like it was yesterday. Scott said, "Bro, I don't know what you're talking about, I never sent any cocaine up there."
>
>      The next week or so Pat Cambron came to Maine to collect money from Case, and Pat told me that he was doing a few things with Case on his own. I told him I didn't want to be involved in any way, and that I didn't even want to know anything. A few weeks later, though, Pat did tell me that he sold Case 1/2 kilo of coke and then some ounces.
>
>      Never, in my entire relationship with Scott Barbour, have we ever conspired to sell cocaine. Nor did Scott ever send Steve Case cocaine. I know this because Pat told me that Scott did not have anything to do with the cocaine being sold to Case. Besides, Scott hated Case. I don't think the two had even spoken since the disagreement in Texas in December. As far as I know, Scott had no involvement in cocaine other than using it himself.

(May Aff. at 5-7.)   This portion of May's affidavit is really not relevant to Barbour's ineffective assistance claims so I address it vis-à-vis his fifteenth – actual innocence – ground.

Case a substantial amount of money for cocaine.  (Id.)  The airing of this information was necessary, Barbour argues, to demonstrate to the jury that Case was a cocaine dealer long before he became involved with Barbour and this is evidence that at other times Case obtained cocaine independently of Barbour.  (Id.)  Barbour believes that if counsel had explored this evidence "a jury almost certainly would have returned a not guilty verdict on Count One." (Id. at 19.)

The United States responds that the jury was aware that Case had served a sentence on robbery and kidnapping charges and was also informed of the fact that he was an active drug trafficker.  (Gov't Mot. Summ. Dismissal at 8; Trial Tr. 281.)  It points out that under Federal Rule of Evidence 609 only the fact of the prior conviction is admissible impeachment material and that subsection (b) of Rule 608 expressly precludes extrinsic evidence of instances of misconduct, which is what Barbour envisioned as a mode of attack on Case's credibility.    I agree with the United States that defense counsel did not perform inadequately in not pursuing this wild goose.  And, with respect to the Strickland prejudice prong, I disagree with Barbour's contention that had this tangential evidence somehow been admitted it would have such an impact on the jury verdict given the other evidence concerning Barbour's involvement in the cocaine shipments to Maine.

### Evidence of Case's Flight (Ground III)

In his third ground Barbour describes the details of Steven Case's "unlawful flight" from state authorities for probation violations pertaining to the burglary, robbery, and kidnapping convictions; Barbour asserts that his attorney should have pressed harder for admission of the details of the incident.  (Am. Sec. 2255 Mem. at 19-21.)  Barbour

concedes that his attorney articulated a reason to allow the details to come in on the grounds that they went to Case's credibility and the prosecutor argued that these details, as distinct from the fact of the prior conviction, were inadmissible under Federal Rule of Evidence 609.  (Id. at 19.)

During the sidebar discussion on the admissibility of this evidence Barbour's attorney explained that Case's flight "was quite an elaborate story": "Probation officer came to his house, he barricaded himself in the barn, he smashed through the doors of the barn with a snowmobile, crashing into the night, spilling cocaine which they found. They found guns, they found drugs." (Trial Tr. Vol. II at 285.)  After his escape Case contacted his probation officer and was told that he was facing twelve years and Case then called the drug enforcement agency in an effort to negotiate.  Case told the agency that he had information and he was told again that he better surrender.  (Id. at 285-86.)  The Court then said:  "But the government's position is [that] the underlying stuff is not relevant, what's relevant is whether he thought he was facing 12 years, and as a result of that, did something. … Can't you just ask him, didn't your probation officer tell you you were facing 12 years, ignoring the underlying stuff?"  (Id. at 286.)   And Barbour's attorney indicated that this was acceptable.  (Id.)

Barbour complains that his attorney should have known that the evidence was inadmissible under Federal Rule of Evidence 609 and should have instead argued for its admission under Rules 608(b) and 405.  (Am. Sec. 2255 Mem. at 20.)  Barbour also opines that the prosecutor's alternative assertion that the evidence's probative value was outweighed by Rule 403 concerns was accepted without the prosecutor being pressed to explain why the evidence was not relevant and without the government's formal objection

on the grounds of relevancy.  (Id. at 20-21.)   He also thinks that counsel should have argued that "the evidence was critical to refute Case's claim on direct examination that [he] had 'shut down quite a bit' [of] his drug trafficking activities, as well as to advance the defense theory that Case was involved with cocaine on his own (without Barbour) before, during and after his interaction with Barbour."  (Id. at 20-21.)

Needless to say, in weighing this claim, this Court can draw on its own first-hand knowledge of its view of the admissibility of the details surrounding the Case escapade, having presided over a sidebar devoted to the issue of the admissibility of evidence detailing the drama of the Case flight, see United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993).  It seems the obvious conclusion is that defense's counsel's performance on this score passes the Strickland performance test.

### Alleged Prosecutorial Misconduct (Ground IV)

In his fourth ground Barbour argues that trial counsel delivered ineffective assistance of counsel when he failed to object to the prosecutor's pervasive misconduct. (Am. Sec. 2255 Mem. at 21.)  Barbour explains that his brief to the First Circuit Court of Appeals "raised a plethora of prosecutorial misconduct claims" but because trial counsel failed to object at trial the First Circuit reviewed his claims under a plain error standard. (Id.)  He notes that had counsel made objections at trial the review would be for harmless error,[6] and, as the government's case on the cocaine count was in his view thin, the First Circuit "would have had no choice but to reverse the cocaine conspiracy conviction."  (Id. at 21-22.)

In support of this ground Barbour attempts to incorporate the relevant section of his appellate brief but Barbour has not filed his appellate brief with the Court.  However,

---

[6]       Federal Rule of Criminal Procedure 52(a).

I was able to access his reply brief through a third-party electronic service and it gives

extensive attention to his prosecutorial misconduct claims.  (Reply Brief of Appellant at

6-18, <u>United States v. Scott A. Barbour</u>, No. 03-1299, 2003 WL 24192588 (1st Cir. Jan. 1

2003).

      The First Circuit Court of Appeals reviewed these explicated claims of

prosecutorial misconduct as follows:

>     We review Barbour's claims of prosecutorial misconduct for plain error because he failed to object at trial. <u>United States v. Roberts</u>, 119 F.3d 1006, 1013-14 (1st Cir.1997).
>
>     First, Barbour claims that the Assistant Attorney changed facts in Baril's proffer reports, which rendered them inaccurate and unreliable, and then used the reports during his impeachment of Barry May. The proffer reports were investigative reports prepared by agents of the Maine Drug Enforcement Agency after interviews with cooperating witnesses. Barbour's brief argues that by reviewing and revising proffer reports, the Attorney rendered them unreliable and then injected the contents of the reports before the jury without defense counsel being made aware of the tampering.
>
>     Barbour's only support for claiming the Assistant Attorney changed facts is that some of the facts in the reports differed from Baril's recollection or from another witness's recollection. If the proffer reports do not coincide perfectly with the witnesses' memories, that inconsistency does not establish that the Attorney changed facts in Baril's proffer report. Baril said during the sentencing hearing that, during an interview, he routinely tries to take notes verbatim and he types them into a report as soon as possible. A copy of that report is sent to the prosecutor, any agents who attended the interview, the witness, and the defense attorney to be reviewed for accuracy. After the report is written and signed, any corrections are made in a supplemental report. Barbour received a copy of Baril's handwritten notes from the interviews. The record does not establish plain error because Barbour has not shown that the Assistant Attorney tampered with any of the proffer reports.
>
>     Second, Barbour contends that the Assistant Attorney improperly bolstered the government's credibility during the trial. The Attorney periodically questioned witnesses about what they told "us" or the "agents" in their proffer sessions. Barbour argues that by identifying himself with the agents, the Attorney improperly borrowed the prestige of those agents. Barbour argues that the Attorney repeatedly mentioned that the witnesses told a different story to government agents to imply that because the agents worked for the government, their recollection was

more likely to be the truth than the witnesses' recollection. We are persuaded by the government's explanation that the Attorney used those words as context, to explain to the court and the witnesses to which interviews he was referring. An assistant attorney's cross-examination of a witness with an inconsistent statement would be of doubtful value if he were not permitted to delineate between conversations by giving the witness more context. May participated in several proffers and at one point during the trial, for clarification, had to ask the Attorney, "Is this the proffer I did with you?" There is no indication that the Attorney was attempting to bolster the government's credibility with those references.

The Assistant Attorney also said, "So I guess the agents got that wrong" when confronting May with an inconsistent statement. Even if the isolated question indirectly implied that the government was more credible than the witness, the question still does not rise to the level of plain error in this case.

Third, Barbour claims that the Assistant Attorney made two improper comments during closing argument about Barbour's failure to testify.

Comments by a prosecutor on a defendant's failure to testify violate the Fifth Amendment guarantee against self-incrimination. Griffin v. California, 380 U.S. 609, 615 (1965). This court looks at whether the prosecutor's language shows a manifest intention to comment on the defendant's failure to testify and whether the jury would naturally and necessarily understand it to be a comment on the defendant's failure to testify. United States v. Wihbey, 75 F.3d 761, 769 (1st Cir.1996).

In this case, the Assistant Attorney said, "But if you want to really find out what went on, go to the people on the inside ... [t]hose are the only people who laid it out for you."  The government contends that the Attorney meant that the conspirators were credible witnesses because their information came from their position inside the conspiracy.  That interpretation fails to explain why he said they were "the only people who laid it out for you."  The Attorney's intention could have been to comment only on the credibility of his witnesses, but this last phrase raises the possibility he was commenting on Barbour's failure to testify or present witnesses. But it seems more likely that he was comparing the insiders to the other witnesses who testified.

The Assistant Attorney's second comment referred to one of Barbour's taped phone conversations. He said, "The best witness in this case I submit to you is Mr. Panasonic.... Mr. Panasonic allowed you to listen to this defendant."  That comment may also be open to more than one interpretation. Perhaps the Attorney was suggesting only that the taped evidence was the best, most objective evidence in the trial. In closing, the Attorney explained that "Mr. Panasonic has nothing to gain or lose. Mr. Panasonic has not been impeached one iota."  On the other hand, "this allowed you to listen to this defendant" arguably might be interpreted as a reminder to the jury that Barbour did not take the stand to explain the

taped conversations and as a reminder that the prosecution was the only party who made it possible for the jury to listen to the defendant.

Assuming, arguendo, that the Assistant Attorney's comments are each capable of at least two possible interpretations, one impermissible and one innocent, it would not profit Barbour here. In these situations we have cautioned, "A court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning." Wihbey, 75 F.3d at 770 (citations omitted). Nor should we assume the jury will draw from the comments the most damaging meaning. United States v. Newton, 327 F.3d 17, 27 (1st Cir.), cert. denied, 540 U.S. 928 (2003). Wihbey reviewed two comments similar to those in Barbour's case. First, the prosecutor mistakenly named the defendants among those who testified; he then said, "You've heard from all of those witnesses except for obviously the two Defendants ..." Id. at 768. The court agreed that the prosecutor was trying to correct his earlier mistake and the jury would understand his statement as a correction. Id. at 770. Second, the prosecutor stated that defense counsel could not "explain away" a conversation that another witness testified about. Id. at 769. The court categorized that statement as a "how-does-counsel-explain" Griffin violation, but held it was not plain error, stating that the comment did not seriously affect the fairness and integrity of the proceedings for two reasons. Id. at 770-71. First, the jury was instructed on the defendant's right to not testify and on the government's burden of proof, and second, the evidence against the defendant was strong, even if not overwhelming. Id.

Even if the Assistant Attorney intended the comments to be a reference to Barbour's failure to testify, or if the jury believed them to be, the comments did not likely affect the outcome of the trial. The potential influence of those comments on the jury was mitigated by the jury instructions, which stated that the defendant had no obligation to testify and repeated the government's beyond-a-reasonable-doubt burden seventeen times. The evidence of Barbour's guilt was strong, although the specific drug quantities and length of the conspiracy were disputed. If the comments were objectionable, Barbour did not object, and the comments do not rise to the level of plain error. See, e.g., United States v. Moran, No. 03-2148, 2004 WL 2900357 (1st Cir. Dec.15, 2004).

United States v. Barbour, 393 F.3d 82, 89 -91 (1st Cir. 2004).

When push comes to shove, this ground juxtaposes the plain and harmless error standards apropos a direct appeal with the Strickland performance and prejudice inquiry. That is, if the First Circuit Court of Appeals decided that the error was not plain – did not seriously affect the fairness and integrity of the proceedings/did not effect the outcome of

the proceedings -- then it seems that the conclusion must be that there was not a reasonable probability that the outcome of the trial would have been different if it were not for counsel's alleged failures with respect to the prosecutor's conduct.  Furthermore, if the error was not "plain" how could one conclude that counsel was not performing adequately under <u>Strickland</u>, that he made errors so serious that he was not functioning as counsel.

      In addition to incorporating his prosecutorial misconduct claims lodged in his direct appeal, in his amended 28 U.S.C. § 2255 memorandum Barbour urges that "there is one specific example of prosecutorial misconduct" that he would like to "highlight" because of its "direct impact" on the weapon enhancement.  (Am. Sec. 2254 Mem. at 22.) His beef is with a leading question by the prosecutor to Barry May asking May if he went to Houston, Texas on one occasion to collect a debt.  (<u>Id.</u> at 23; Trial Tr. Vol I at 83.) May responded in the affirmative.  (Am. Sec. 2254 Mem. at 23; Trial Tr. Vol I at 83.)  In short course the prosecutor asked May if by the time of this trip Shane Hall was working for Barbour.  (Am. Sec. 2254 Mem. at 23; Trial Tr. Vol I at 86.) And, again, May answered in the affirmative.  (Am. Sec. 2254 Mem. at 23; Trial Tr. Vol I at 86.)  From the prosecutor's leading-question-misconduct, Barbour asserts, "flowed a false perception" that the incident in Houston involving the gun was a debt collection attempt and that at that time Shane was a member of the conspiracy.  (Am. Sec. 2254 Mem. at 23.)  Barbour cites his own testimony at his sentencing in which he pronounced that the incident was not a debt collection attempt but was an assault attempt, that May did not go to Houston looking for Case, that May and Barbour did not know Case was in town until Barbour received a call at a bar, and that at the time of the gun incident Hall was not a

member of the conspiracy.  (Id. at 23.)   "Trial counsel should have objected to the leading questions," Barbour opines, "[a]nd while it may seem unusual that a few leading questions could affect the outcome of a proceeding, in the case sub judice that is exactly what happened."  (Id. at 24.)

Although defense counsel might have had grounds to object to the form of the question, the questions were run-of-the-mill leading questions, the on-the-spot remedy for which would have been for the prosecutor to back-track and rephrase in a non-leading manner.  I am confident that this highlighted episode does not tip the scale in favor of Barbour on his prosecutorial misconduct ineffective assistance ground.[7]

---

[7]        In the May affidavit attached to Barbour's supplemental memorandum May tells the following version of his interactions with the Assistant United States Attorney:

> In a session, conducted prior to Barbour's trial, Assistant United States Attorney Jonathan Toof stated to me, "Don't worry at trial when you are on the stand; all you have to do is say 'yes, Sir' to the questions I ask you about Scott Barbour."  At the time, I took this statement not to mean that Mr. Toof expected me to be complicitous in any acts of dishonesty, but, rather, that, in order to make things easier for me he would simply recite things that I had told him and I would confirm them.  However, during my testimony at Barbour's trial it became evident to me that Mr. Toof expected me to say things that were not true.  As just one example, on re-direct-examination, Mr. Toof asked me, "Do you recall telling these agents that from October, 1999, to April, 2000, Barbour shipped to you at least 50 pounds of marijuana every week and sometimes twice a week?  …Mr. Toof must have known that I had never made this statement because he was present when I said that between October, 1999, to April, 2000, Barbour shipped me 20 to 50 pounds of marijuana at a time, and that these shipments occurred sometimes once a week, sometimes twice a week, and sometimes once every four or five weeks, depending on quality.  Moreover, Barbour later [t]old me that Mr. Toof called MDEA Agent Baril to the witness stand in order to impeach my testimony, but that, as to the specific example cited above, Agent Baril confirmed rather than impeached my testimony.
>
> Recently, Scott Barbour asked me to review my entire testimony and to point out anything that I felt was inaccurate.  Based on Mr. Toof's unethical conduct described above, I decided to grant Barbour's request.  In other words, because Mr. Toof had instructed me prior to trial to answer "Yes, Sir" to his questions, and because he clearly expected me to lie, at least about drug quantity, I became concerned that Mr. Toof may have advanced other untruths and/or mischaracterizations that I may have inadvertently confirmed.  I was also concerned because, at the time of Barbour's trial, my mental state and my memory were seriously and adversely affected by a series of traumatic events that occurred in my life leading up to the trial.

(May Aff. at 1-2.)   May notes, however:  "After reviewing my testimony, aside from some minor inconsistencies, it appears fairly accurate."  (Id. at 3.)

### *Failure to Object to Hearsay Evidence (Ground V)*

In his fifth ground Barbour points to two instances of hearsay testimony that he believes rendered his conviction on the cocaine conspiracy count fundamentally unfair. (Am. Sec. 2255 Mem. at 24.)  First, the prosecutor questioned Steven Case on his 'pick-up' of seventeen ounces of cocaine from Barry May's house.  (Trial Tr. Vol. II at 260-61.) Case testified that he saw thirty-five ounces of cocaine on May's coffee table and that this was an ounce short of a kilo.  (Id. at 261.)

> Q.    You knew there was an ounce, but it was missing some place?
> A.    Yeah.
> Q.    Did you ask May what happened to the extra ounce?
> A.    He said Scott got into it while he was packaging it.

(Id. at 261-62.)

The second hearsay statement that Barbour contends counsel should have objected to in Barbour's view was when Shawn Libby testified that John Ross told him he had acquired cocaine from Barbour.  (Am. Sec. 2255 Mem. at 25; Trial. Tr. Vol. II at 500.)  Barbour urges:  "There is not once scintilla of evidence in the record to even suggest that Ross and Barbour were members of a cocaine conspiracy."  (Am. Sec. 2255 Mem. at 25.)

As the United States points out, any competent counsel would have abstained from objecting because the statements were admissible under Federal Rule of Evidence 801(d)(2)(E) as co-conspirator hearsay. With respect to the Libby testimony, the statement was admissible because Libby was a co-conspirator with Barbour in the marijuana conspiracy.

22

### Maine Drug Enforcement Agent Gerry Baril's Testimony (Ground VI)

In his sixth ground Barbour complains of his attorney's inaction in response to the testimony of Maine Drug Enforcement Agent Gerry Baril's testimony that there was 35.7 ounces in a kilogram when in fact there are 35.2 ounces in a kilogram.  (Am. Sec. 2255 Mem. at 26; Trial Tr. Vol. IV at 713-14.)  The one-half ounce error Barbour stresses, "is especially perplexing considering that in terms of cocaine, one half ounce equates to a street value of approximately $1,400."  (Am. Sec. 2255 Mem. at 26.)  The prejudice to his case that Barbour articulates is that Baril's testimony corroborated Steve Case's testimony that an ounce of cocaine was missing from the kilogram adding to Case's credibility and impacting the jury's verdict on the cocaine conspiracy count.  (Id.)

The United States points out that Baril's testimony about the conversion rate pertained only to the marijuana conspiracy which is not part of Barbour's challenge. (Gov't Mot. Summ. Dismissal at 12.)  I agree that the possible impact of this testimony on the jury's view of the Case testimony vis-à-vis the cocaine is too attenuated to suggest measurable material prejudice in counsel's failure to object to the conversion figure offered by Baril.[8]

### Failure to Investigate Daryl Terry as a Defense Witness (Ground VII)

The seventh ground that Barbour presses is that his attorney should have investigated the possibility of calling as a witness a man named Daryl Terry who was an inmate at the Cumberland County Jail.  (Am. Sec. 2255 Mem. at 27.)  Barbour explains that prior to trial he hired a private investigator who spoke with Terry and Terry told the investigator that he had overheard conversations between fellow inmates Steve Case and

---

[8]       The United States goes on to argue that this testimony could not have altered this Court's sentencing calculations; Barbour's memorandum does not raise this argument.

Kevin Woodward in which Case and Woodward were planning their testimony for Barbour's trial.  (Id.)  The two allegedly agreed to "play up" Barbour's role.  (Id.; Docket No. 1-4.)

The investigator's interview report on Terry contained the following paragraph concerning the Terry/Case/Woodward interaction:

> There were three or four occasions when they all sat at the table playing cards.  Terry overheard conversations between Case and Woodward.  The conversation centered on their cases (Case, Woodward) and another person, who was involved named Scott.  They talked about testifying against Scott, hoping of receiving a lesser sentence if they were convicted.  They said that Scott was going to take the fall for everything.  They were going to make sure Scott got what he deserved, putting all the blame on Scott.  Case and Woodward talked about playing up Scott's role in their case(s) and reducing their responsibilities/actions.  Case and Woodward discussed that they would say that they only held the drugs, pot and coke, for Scott.  They also would say Scott was the leader and that they were not dealing the drugs.  Terry stated that Case was the instigator of the conversations concerning Scott.

 (Docket No, 1-4 at 1.)  Terry told the investigator that he was not a "'Rat'" and that he did not want to testify but would if he was subpoenaed on Barbour's behalf.  (Id. at 2.) According to Barbour he instructed his attorney to call Terry as a witness but his attorney did not do so and offered no explanation for not doing so.  (Am. Sec. 2255 Mem. at 27; Barbour Aff.  at 6.)

The United States responds that competent counsel would have understood that the out of court statements by Case and Woodward would be subject to hearsay objections.  (Gov't Mot. Summ. Dismissal at 14.)  It also downplays the impact of their statements that they were going to "play up" Barbour's role as this "is hardly the same as to commit perjury."  (Id.)  It thinks that counsel could have made a tactical decision not to call Terry because of his expressed reluctance to testify.  (Id.)  And it argues that the

impeachment of Case and Woodward through Terry would have been cumulative, noting that there was other evidence corroborating their testimony.  (Id.)

I am not sure I agree with the Government's assessment that competent counsel would have walked away from Terry because his testimony would have been subject to hearsay objections.  Perhaps at an evidentiary hearing defense counsel could articulate a competent trial strategy reason for walking away from this evidence, but it is not plainly obvious to me.  Clearly having Terry available as a witness would have given Barbour added impeaching evidence if Case and Woodward testified at trial that they never discussed a plan to place the blame at Barbour's door.  The Terry testimony, thus, did provide the potential of additional impeaching evidence, but in the end I agree with the Government that it would have been cumulative of other impeaching evidence and, therefore, was unlikely to change the outcome of the proceedings.  I do not think it is necessary to convene an evidentiary hearing focused solely on counsel's performance regarding this one item of evidence.

### *Cumulative Ineffectiveness (Ground VIII)*

In the eighth ground Barbour asks the court, in the event it does not think that the above alleged on trial counsel's part in and of themselves necessitate a new trial, to find that the individual errors when aggregated satisfy his burden for demonstrating ineffective assistance.  (Am. Sec. 2255 Mem. at 28.)

"Strickland clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced.'"  Dugas v. Coplan, 428 F.3d 317, 335 (1st Cir. 2005) (quoting Kubat v. Thieret, 867 F.2d 351, 370 (7th Cir.1989)).  However, this is not a case that generates such a claim.  It should be clear from my

discussion of Grounds One through Seven that not only do I disagree with Barbour that counsel's asserted shortcomings individually arise to the level of inadequate performance, I can find nothing of any weight in Barbour's discontents with counsel's performance to even begin to aggregate on a theory of cumulative infirmity.  See cf.  United States v. Sampson, __ F.3d __, __ 2007 WL 1393742, * 35 (1st Cir. May 7, 2007) ("None of its individual rulings worked any cognizable harm to Sampson's rights. It necessarily follows that the cumulative error doctrine finds no foothold in this appeal.").

### Failure of Sentencing and Appellate Counsel to Argue that the Jury Instructions on Drug Quantity Precluded a Sentence above the Default Statutory Maximum of Twenty Years on Count One and Five Years on Count Two (Ground IX)

Barbour notes in his ninth ground that in his direct appeal he argued that the Court erred when it failed to instruct the jury that the drug quantities listed in the indictment were elements of the offenses that the United States had to prove beyond a reasonable doubt.  (Am. Sec. 2255 Mem. at 28.)  The First Circuit Court of Appeals reasoned as follows apropos the substantive issue underlying this claim:

> Barbour argues that the district court did not properly instruct the jury on the government's burden to prove the drug quantities from the indictment, as required by Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). The district court instructed the jury that it must find elements beyond a reasonable doubt, but did not characterize the drug quantity determination as an element. Barbour argues this error denied his Fifth and Sixth Amendment rights to a jury verdict on the drug quantities.
> The district court included the drug quantities in the verdict form. The verdict form asked, "Did the cocaine conspiracy involve, in total, at least 500 grams of cocaine?" The jury checked the "yes" box. The verdict form asked, "Did the marijuana conspiracy involve, in total," listing several quantities, with instructions to check only one. The jury put a checkmark next to "at least 50 kilograms of marijuana." The jury instructions stated that if the jury found Barbour guilty, it must determine the drug quantities involved, and stated seventeen times that the government's burden of proof was beyond a reasonable doubt.
> Barbour raises this Apprendi argument for the first time on appeal; he did not object to the jury instructions at trial or at sentencing. He asks

that we excuse his failure to object because the case that established that Apprendi errors may be raised at sentencing was decided after Barbour's sentencing. United States v. Nelson-Rodriguez, 319 F.3d 12 (1st Cir.), cert. denied, 539 U.S. 928 (2003). Because confusion existed, in Nelson-Rodriguez we assumed that the defendants preserved their objections if they objected either before the jury instructions were given or at sentencing. Id. at 47-48. Barbour did neither, so even if we made the same assumption for him, we would still review for plain error. Id. at 47-49.

Under the plain error standard, we reverse only if a "clear and obvious" error occurred. United States v. Perez-Ruiz, 353 F.3d 1, 9 (1st Cir.2003) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir.2001), cert. denied, --- U.S. ----, 124 S.Ct. 2058 (2004)). That error also must affect the defendant's substantial rights and must seriously impair the fairness, integrity, or public reputation of judicial proceedings. Id.

Any fact, other than a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. Apprendi, 530 U.S. at 490. In Perez-Ruiz, we applied the Apprendi rule to drug quantity determinations. 353 F.3d at 16.

Barbour interprets United States v. Goodine, 326 F.3d 26 (1st Cir.2003), cert. denied, --- U.S. ----, 124 S.Ct. 1600 (2004), as requiring elements to be found beyond a reasonable doubt, but allowing sentencing factors to be found by a preponderance of the evidence. In Goodine, the jury found certain drug quantities, but the judge considered additional quantities in sentencing the defendant. Id. at 27. We applied a preponderance of the evidence standard to the quantities found by the judge and called them sentencing factors rather than elements. Id. at 32. Goodine held that Apprendi was not violated when the sentence imposed exceeded the guideline range for the indicted amount but did not exceed the maximum statutory penalty for the drug quantities found by the jury.

Where a fact finding, other than a prior conviction, increases the statutory maximum, under Apprendi and Harris v. United States, 536 U.S. 545, 550 (2002), the fact must be found by the jury beyond a reasonable doubt. The Supreme Court explained that if, because of the existence of a particular fact, the penalty is to be increased beyond the statutory maximum, that fact must be found by the jury regardless of whether it is a sentencing factor or an element. Harris, 536 U.S. at 550.

The maximum sentence for convictions in which no particular quantity was proved is twenty years for cocaine and five years for marijuana. 21 U.S.C. § 841(b)(1)(C), (D) (2000). The district court sentenced Barbour to 420 months, or thirty-five years, which exceeds the twenty- and five-year statutory maximums in the absence of a quantity determination. Under Harris and Apprendi, before Barbour could be sentenced beyond the statutory maximums based on quantity, the drug quantity must be found by the jury beyond a reasonable doubt. The

question in this case is whether, on the instructions given, the jury would have understood that it had to find the drug quantities beyond a reasonable doubt.

We held that the jury had not been instructed that it must find drug quantities beyond a reasonable doubt in United States v. Perez-Ruiz and United States v. Nelson-Rodriguez. In Perez-Ruiz, the judge read the quantities listed in the indictment to the jury once and elsewhere stated that the jury must find beyond a reasonable doubt that the indicted conspiracy existed. 353 F.3d at 16. We held that instructions did not forge the necessary link between the concept of drug quantity and the beyond-a-reasonable-doubt standard. In United States v. Nelson-Rodriguez the court provided a copy of the indictment, which listed the drug quantities, to the jury, but the jury was asked to find only whether there was the conspiracy as indicted, not whether the drug amounts in the indictment were correct. 319 F.3d at 45. The result was that the jury only found that the charged conspiracy existed but did not determine the drug quantities. Id.

Here, in contrast, the jury was given three choices of drug quantities- not all or nothing, but a multiple choice. The jury was asked to specify drug type and quantity, and it did so. It is not tenable to compare this case to Perez-Ruiz or Nelson-Rodriguez, in each of which the jury was not permitted to specify amount and was not alerted to the need to consider the amount in its own right. Here, the district court included the drug quantities in the verdict form. The jury was instructed that if it found Barbour guilty, it would also "have to answer one or more questions concerning the quantity of the substance involved which may affect the potential sentence." The jury instructions contained seventeen references to the government's beyond-a-reasonable-doubt burden of proof. The jury was clearly instructed that the defendant's guilt must be proven beyond a reasonable doubt, and the drug quantity questions that immediately followed connected that burden of proof to the drug quantity determination. The instructions in this case contain a more precise finding of drug quantity and contain a closer link between the burden of proof and the jury's quantity determination than the instructions in either Perez-Ruiz or Nelson-Rodriguez. The district court did not commit plain error when it instructed the jury on the government's burden of proof and included the drug quantities involved on the verdict form.

Barbour, 393 F.3d at 87 -89.

In his 28 U.S.C. § 2255 memorandum Barbour insists that "the jury instruction on

drug quantity was sufficiently disconnected from the concept of a guilt or innocence

determination and its concomitant standard of proof that [a]n impermissible risk existed

that the jury determined Barbour's level of culpability on a standard below that to which

they determined his guilt."  (Am. Sec. 2255 Mem. at 28-29.)  He asserts that, because of

the failure of counsel to press the claim, the First Circuit did not consider this issue of

unanimity. (Id. at 29.)  He contends that "the error was not a jury instruction error; it was

a sentencing error."  (Id. at 30.)   Accordingly, it was counsel's obligation at sentencing to

object when the Court sentenced him above the default statutory minimum on both

counts.  (Id.)

In support of this ground Barbour notes that in the trial management conference

the issue of how to deal with jury findings on drug quantity after Apprendi received

considerable attention.  As this Court is well aware, there was, indeed, considerable

discussion at the trial management conference concerning this question. (See Trial

Management Conference Tr. at 19- 24.)  Barbour attaches a copy of the jury verdict form

that he believes counsel should have insisted be the final form given to the jury.  (Docket

No. 11-6.)  That proposed form asked in the operative subsections whether all twelve of

the jurors agreed to the drug amounts.   The final jury verdict form did not include the do-

all-twelve-of-you-agree language (Crim. No. 01-92-P-H, Docket No. 37) the Court

explaining after the close of evidence at trial:

> Counsel, I have distributed a revised jury charge reflecting what we talked
> about yesterday.  There is a change on the form as you will see that I've
> concluded the appropriate way is to go forward and deal with any question
> of hung jury on the quantities if and when that develops.  Otherwise I
> think it reflects exactly what we talked about … during the charge
> conference.

(Trial Tr. Vol. IV at 722.)[9]  Barbour frames the question, then, as whether, had sentencing counsel objected to the court's approach to the jury verdict form, the 'error' could have been deemed harmless by the First Circuit Court of Appeals?  (Am. Sec. 2255 Mem. at 31 - 32.)[10]

With respect to the performance of sentencing counsel on this score, this Court had already made clear what its stance was as to jury verdict form.  With regards to counsel's performance in pressing the appeal to the First Circuit I echo my reasoning vis-à-vis Barbour's fourth – prosecutorial misconduct—ground: the First Circuit's conclusion that any error was not plain seems to answer the Strickland performance and prejudice question.

***Failure of Sentencing and Appellate Counsel to Argue that Certain Drug Quantities were not Within the Scope of the Jointly Undertaken Criminal Activity, were not Reasonably Foreseeable by Barbour, were Double Counted, and that the Court Was Required to Make an Individualized Finding of Drug Quantity (Ground X)***

Barbour devotes almost twelve pages of his 28 U.S.C. § 2255 memorandum to his tenth ground.  He acknowledges that sentencing counsel argued strenuously that Barbour should only be held accountable for drugs distributed between January 1999 and October 2000, when Barbour went to prison.  (Am. Sec. 2255 Mem. at 37.)  And he concedes that sentencing counsel did press attribution issues to the Court.  (See Sentencing Tr. at 313-23.)  Nevertheless, Barbour complains that the Court "conducted no reasonable foreseeability analysis and made no individualized findings" and that "it was objectively

---

[9]      As Barbour points out, there does not appear to be a transcript of the referenced discussion on the preceding day.

[10]      Included in this ground is Barbour's added contention that this Court erred when it imposed his sentence because the jury was not required to make a finding as to Barbour's individual drug-quantity responsibility but could make the drug-quantity determination on a conspiracy-wide basis, offering a "poor Gerry" hypothetical in which Gerry is only willing to take responsibility for two kilograms of marijuana but faces life imprisonment (as opposed to five years) because his co-conspirators agree to acquire 1,000 kilograms of marijuana.  (Id. at 33-36.)

unreasonable for sentencing and appellate counsel to miss this glaring error." (Am. Sec. 2255 Mem. at 38.) He cites the testimony of Barry May – set forth above in the discussion of his second -- Stephen Shane Hall -- ground, in which May indicated he was surprised to be on the receiving end of the cocaine shipment and was not certain whether it was Barbour or Stephen Shane Hall who had sent the cocaine. (Id. at 40-41; Trial Tr. Vol. I at 99-100.) Barbour argues that May's testimony clearly "does not provide any evidence that the kilogram of cocaine was part of the jointly undertaken criminal activity that Barbour agreed to be involved with." (Am. Sec. 2255 Mem. at 41.) Barbour also observes that the First Circuit relied on Steve Case's testimony linking Barbour to the cocaine -- excerpted above apropos Ground V -- and, while recognizing that the First Circuit captured the "the essence of Case's testimony" he asserts that Case's testimony on this topic was "demonstratively false." (Am. Sec. 2255 Mem. at 41-42; Trial Tr. Vol. II at 260-62.) Barbour points to the testimony of May, Woodward, and Ross, testimony that he believes demonstrates the falsity of Case's testimony. (Am. Sec. 2255 Mem. at 42-44.)

With respect to the ineffective assistance hook to this ground, Barbour asserts that appellate and sentencing counsel should have argued that there was double counting of the marijuana, as the First Circuit noted that Barbour did not so argue, see Barbour, 393 F.3d at 92, and that the marijuana was part of the Case/Ross conspiracy and not part of the Barbour/May conspiracy. (Am. Sec. 2255 Mem. at 44.) Barbour allows that Ross probably sent 360 pounds of marijuana to Maine but urges that only 170 of that was sent to Barbour. (Id. at 45.) Again, Barbour faults the court for attributing another 360 pounds of marijuana to Barbour stemming from the time he was in prison. (Id.) He cites

31

a call from May to him in prison in which May suggests that this was a transaction that

May and Massey cooked up and of which Barbour had no foreknowledge.  (Id. at 46.)

And, finally, Barbour asserts that this Court erred in relying on a common scheme and

plan guideline note to define the scope of the joint criminal activity.  (Id. at 47.)[11]

Relevant to this concern (and contradicting Barbour's contention that this Court

failed to make requisite findings) this Court explained during sentencing:

> In a drug offense like this, the sentence is driven under the guidelines by drug quantities.  And the guidelines recognize that no precise determinations of quantity can be made particularly in what we sometimes call an historical case, which is to say, an instance where the activity goes back in time.
>
> So the guidelines instruct the sentencing Judge to approximate the drug quantity.  Case law from the First Circuit instructs the court to be conservative. …
>
> ….
>
> [Sentencing counsel] has made some strong arguments concerning the scope of relevant conduct to be considered, and that's a matter that the guidelines address very explicitly in Guideline 1B1.3.  And I find Subsection (a)(2) to be the pertinent provision for these crimes based upon matters which can be grouped together because the quantity does determine the base offense level.
>
> And in looking at the relevant conduct, I find this to be a classic conspiracy of what is sometimes called the hub and spoke variety, where Mr. Barbour was always the hub, but there were different spokes from time to time.  This kind of conspiracy had been recognized just within the last couple of weeks in the First Circuit, the case being United States v. Rivera-Rodriguez.[12]  And the relevant conduct guidelines along with the notes that accompany it, in particular Note 9, talks about how to analyze that in terms of a common scheme or plan which are the two criteria that come into play.
>
> And for example, under the common scheme or plan, the sentencing Judge is to look at such things as was there a common purpose, was there a common modus operandi, in other words, how the crime was committed, was the leader the same, overlapping accomplices.

---

[11]     Here Barbour offers another hypothetical, this time as to a pair of guys who had sold marijuana together twenty years ago and agree to "do that again" vis-à-vis a sale of marijuana to "ol' Margaret" in Maine.  (Id. at 47.)  Barbour reasons that the two sales may be part of a common scheme of plan under the guidelines but that they are clearly two separate agreements.  (Id. at 48.)

[12]     318 F.3d 268 (1st Cir. 2003).

I find those things to be true here, there was a common purpose, there was a common scheme or plan of the modus operandi in the sense of bringing the drugs from Texas to Maine. They had to change the particular format from time to time as one got caught by authorities or didn't work as in the Volkswagen [vehicles]. The leader stayed the same, there was some overlapping of accomplices. I find therefore that it is part of the relevant conduct to include the activity starting in 1996 and going forward.

I also find that the time when Mr. Barbour was in prison is to be included. There is such a thing as withdrawing from a conspiracy, but the law on that is fairly clear that it requires an affirmative action by the defendant who claims to have withdrawn to show withdrawal. And there's nothing like that in this case, instead, the contrary, that even after he's in prison, that Mr. Barbour did maintain communications about the conspiracy, about the drug trafficking, no signs of withdrawal at all. And so I conclude that the quantities can be accumulated from 1996 through until 2001.

(Sentencing Tr. at 338, 340 -42.) The Court then indicated "some of the bases for the quantity so that the reviewing court w[ould] have a basis for determining whether it's supported by the evidence." (Id. at 342, see also id. at 342-45.)

The First Circuit Court of Appeals decided the issue as follows:

Under the sentencing guidelines, a defendant may be held accountable for drug quantities involved in his "relevant conduct." This includes acts committed during the commission of the offense, in preparation, in the course of attempting to avoid detection, or, in some situations, conduct that was part of the same course of conduct or common scheme or plan as the offense of conviction. U.S.S.G. § 1B1.3 (2003). The background section of 1B1.3 authorizes judges to look at conduct beyond the crimes charged in the indictment: "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." U.S.S.G. § 1B1.3, comment: backg'd. In the context of controlled substances, the background states that "quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level" if they fit within the definition of relevant conduct. Id.

Barbour's argument is that the government should have charged four separate conspiracies rather than charging a single (1999-2001) conspiracy, and the court should have viewed Barbour's activity before 1999 as a separate conspiracy. The government provided evidence to support the theory of a single evolving drug conspiracy rather than several discrete and separate conspiracies. The district court made a factual

finding that Barbour was the leader of one single drug conspiracy from 1996 to 2001. We cannot say this finding, which was supported by the record, was clearly erroneous. Barbour's conduct can still be relevant, though it may be outside the time frame of the charged conspiracy. The district court's finding of a single conspiracy from 1996-2001 supports the inclusion of the drug quantities as part of the same course of conduct or common scheme or plan as the offense of conviction. The district court made no legal error in its application of the guidelines. Because Barbour's involvement as early as 1996 is supported by the record, the district court did not err in attributing the drug quantities to Barbour as part of his relevant conduct.

Barbour also argues that the court relied on "unreliable" or "inaccurate" information in attributing to him 360 pounds of marijuana and one kilogram and forty-two ounces of cocaine. Barbour claims the marijuana could only have been part of the conspiracy in 1999, but the district court attributed it to Barbour in 1996. The district court relied on John Ross's testimony, a co-conspirator, whom the court found credible for determining drug quantities, even though he was unable to recall the dates of the drug transactions. Barbour does not claim that the marijuana was counted twice. Whether the transaction occurred in 1996 or 1999 makes little difference because the district court found the conspiracy lasted from 1996-2001.

Barry May and Steven Case testified about Barbour's involvement with the cocaine. May testified that he received a kilogram of cocaine in May 2000. He said "they all were involved with it," but that it was either Barbour or Shane Hall who actually sent the cocaine to him. May took some of the cocaine to Kevin Woodward's house to be divided. Case testified that in May 2000, he saw almost a full kilo of cocaine at May's house, and that May told him that Barbour took some of it when he packaged the kilo. Case also testified that Barbour sent him another forty-two ounces of cocaine around the time that Barbour was leaving Texas. The district court was only required to find by a preponderance of the evidence that these drug quantities were part of Barbour's relevant conduct. United States v. Laboy, 351 F.3d 578, 582 (1st Cir.2003). The record supports each drug quantity determination, and we find no clear error in the district court's application of the guidelines to the facts.

Barbour, 393 F.3d at 91 -93.

Barbour is merely back-filling with his challenges to this Court's sentencing

determination and little of what he sets forth in this ground goes to the quality of

counsel's representation. With respect to the underlying merits of his claim that too much

marijuana was ascribed to him, this Court and the First Circuit have already fully

34

examined this issue.  Barbour does argue that sentencing and appellate counsel should have made some sort of double counting argument vis-à-vis the marijuana attributed to Barbour, based on a distinction between the May/Barbour conspiracy and the Case/Ross conspiracy.  However, this argument is premised on his attack on the Case testimony as "demonstrably false" and Barbour has no basis, especially at this late stage of the game, to argue that at the time of sentencing and the appeal his attorney had a defensible argument for attacking the testimony that provided the reason for attributing the amount of marijuana to Barbour.

### Sentencing Counsel's Failure to Properly Argue Against the Weapon and Obstruction of Justice Enhancements (Ground XI)

#### Weapon's Enhancement

With respect to Barbour's eleventh ground as it pertains to the weapons enhancement, Barbour insists that it was Stephen Shane Hall, alone, who possessed the firearm.  (Am. Sec. 2255 Mem. at 48.)  Barbour recognizes that this Court found that the weapon possessed in furtherance of the conspiracy and that the weapon's possession was reasonably foreseeable by Barbour; here he argues that the Court did not make the necessary finding that the weapon was possessed by a member of the conspiracy. (Id. at 49.)  Barbour asserts: "There is absolutely no evidence that reasonably can refute Barbour's crystal-clear testimony that Shane Hall was not a member of the jointly undertaken criminal activity."  (Id.)

The First Circuit addressed Barbour's weapon enhancement claim as follows:

> Barbour additionally argues that the district court did not have sufficient evidence for the weapon enhancement. Witnesses May and Hall testified that Barbour was among a group who went to collect a debt in Houston. The group started from a bar and dropped by Hall's house to get a gun. Hall went inside and returned with a gun, and the group went to

collect a drug debt from Case. Barbour admitted they went looking for Case to "rough him up."

We upheld a weapon enhancement against May for the same incident. United States v. May, 343 F.3d 1, 7 (1st Cir.2003). In May, we said that in a conspiracy case, the government must show that one of the defendant's co-conspirators "possessed a weapon during the offense." May, 343 F.3d at 7 (quoting Nelson-Rodriguez, 319 F.3d at 59). Then the burden shifts to the defendant to show the connection between the gun and the drug conspiracy was "clearly improbable." Id. Here, the government showed that Hall, a co-conspirator, took a gun with him on the group expedition to collect on a drug debt owed to Barbour and the other conspirators. Barbour failed to provide evidence that the connection between the drug conspiracy and the gun was "clearly improbable." We affirm the enhancement.

Barbour, 393 F.3d at 93.

This Court and the First Circuit Panel concluded that there was sufficient evidence to support the enhancement.   I recognize that Barbour insists that Hall was not a member of the conspiracy, the overwhelming evidence contradicts the proposition. Barbour has not carried his burden in demonstrating that counsel performed inadequately with regards to challenging the enhancement.[13]

---

[13]      Apropos the portion of Barbour's supplemental memorandum pertaining to the gun, May's affidavit reads:

> As to the gun incident, I agreed with the Government's characterization of my trip to Houston as being in an effort to collect a drug related debt.  In actuality, I was already in Houston, either partying or delivering money, when we found out Steven Case was in town.  Scott wanted to assault Case because of a disagreement the two had had the previous December over Case's refusal to pay Barbour the last $3,000 he owed for the ten pounds of marijuana.  Case claimed he didn't owe the money because of some prior transaction.  Scott said, "Fine, no problem," but Scott was mad because he basically felt that Case had bullied him out of the money.  So then a month or so later, we were at a bar in Houston drinking and Scott got a phone call from someone telling him that Case was in town ….  Scott is all drunk and he says, "Hey, let's go beat the shit out of this guy." Shane Hall, who had been in prison with Barbour and had just gotten out said, "sure, but let's run across the street to Kristie's so I can put on pants and sneakers."  ….  Hall ran in the apartment, was only in there long enough to change, and then came back out wearing pants and sneakers.  We went to the place were Scott thought Case was at, but he wasn't there, so we left and went to a bar where Kristie worked.  When we got there Shane gave Kristie a gun.  He said he wasn't going back to the apartment right then, and didn't want to carry a gun around with him.  This was the first time that I had seen the gun.  I had no idea he had it.  From what he said to Kristie, I knew Shane had to have gotten the gun from her apartment when he went there to change, but I didn't know at the time that he had gotten it.  In any case, this incident was not a drug collection attempt.  If Case had

### *Obstruction of Justice*

According to the United States there were six factors supporting the obstruction

adjustment:

> 1) a threatening letter Barbour wrote to Kevin Woodward but signed in the name of an illiterate jailmate named Wilcox; 2) a letter from Barbour to a compatriot named Mercier that predicted that May was "gonna be dead soon"; 3) two letters to John Ross in jail recommending that Ross join "Barry" in "doing the right thing now"; 4) Barbour's letters to May suggesting that May commit suicide, as co-conspirators Cambron and Hunt had already done; 5) May's admission at sentencing that Barbour asked him to testify that Barbour had no responsibility for the gun that produced the weapons enhancement and should be held accountable for no more than 500 pounds of drugs; the Marshal's testimony that while Ross was testifying at sentencing, Barbour pretended to slit his own throat.[14]

---

owed us money I would have collected it in Maine. …. I know in my testimony I said I thought Case owed us $10,000, but the deal was for ten pounds of marijuana.  Barbour would not have charged Case $1,000 a pound if Case was buying it in Texas (which he did).  Nor would Case have paid that much.  I remember now that Scott was all the more upset because he had given Case the marijuana at cost, which would have been $4,000 and that Case only gave him $1,000 saying that Scott owned him money from before he left Maine.  I wasn't involved when Scott and Case first started doing business, so I don't know if Scott owed him the money or not.  I expect he did, or Scott would have asked me to collect the $3,000 in Maine.

> Also, at Barbour's trial Mr. Toof said, "By this time Shane Hall was working for Barbour?"  Without even thinking I simply said "Yes."  In retrospect, I have absolutely no idea whether Shane was working for Scott at the time of the incident.  I know that he had just gotten out of prison and that he didn't go to work for Scott right away because he was selling ecstasy.  I also know it wouldn't be unusual for Shane and Scott to be hanging out, or for Shane to be willing to beat somebody up with Scott, because they were good friends from prison.  Anyway, the incident was not a drug collection attempt and I'm fairly certain that Shane Hall was not working for Barbour at the time.  The trial testimony I provided to the contrary was inaccurate but provided in good faith.  I had no intention of purposely deceiving anyone.  I was simply following Mr. Toof's instruction to say "Yes" to his questions.

(May Aff. at 3-5.)
The first paragraph of this portion of the May affidavit falls far short of constituting "new evidence" sufficient to revisit this Court's or the First Circuit's determinations apropos the weapon enhancement.  As to the second paragraph, it is very equivocal support for Barbour's assertion  that Hall was not a member of the conspiracy as May admits knowing very little about the question and offers only his speculation.
[14]  During Barbour's sentencing hearing John Ross testified that he received two letters from Barbour while he was being detained.  (Sentencing Tr. at 20 -22.)  During Ross's testimony the following exchange occurred:

DEPUTY MARR:          Excuse me counsel.  Your Honor, may I approach.
THE COURT:                Yes.
(Deputy Marr and the court confer, not on the record.)
THE COURT:                Counsel, could you approach, please?
(At sidebar on the record.)

(Gov't Mot. Summ. Dismiss at 19 n. 4.)

After the close of evidence during the sentencing hearing, the prosecutor argued:

I believe the court could add another two levels, and in fact I'm asking the court to add two more levels for obstruction of justice based on the testimony of Barry May here today.  It is clear to me that Mr. Barbour has not just on one occasion prior to his trial, but since trial attempted to influence the outcome of these proceedings with threats of violence.

That is evident if the court reads the letters that we've introduced here today.  And it is evident from Mr. May's testimony although he did not want to admit to that fact.  This man had done everything he can to tamper with the record in this case, and by doing that, tamper with the truth.  And he's done it for one reason, Your Honor, for his own benefit.

(Sentencing Tr. at 309.)

On the topic of the obstruction enhancement, defense counsel opined:

[The prosecutor] spent a good deal of his argument talking about and indeed asked for an enhancement for obstruction of justice, and he cited in particular … what he described as Barry May's change of his testimony from the proffer.

But look what happened at trial.  When agent Baril was called, he testified to exactly what Mr. May had testified to as to those quantities and those frequencies during the relevant period.  It was the proffer that was wrong.

Now were there contacts, were there letters or phone calls in which Mr. Barbour or one of the other defendants tried to urge one of his former colleagues not to become a government witness, yes.  We recognize that defendants have the right to cooperate.  We have joint defense agreements which the law has extended the attorney client privilege to.  It's a natural tendency.  That's a far cry from obstruction in the substantive sense or in the enhancement sense.

---

THE COURT:        Would you please repeat what you just told me?
DEPUTY MARR:        I just saw Scott Barbour while facing the witness use his right hand in the form of a razor and slide it across his throat from his right ear lobe to his left ear lobe … while the witness was testifying.
THE COURT:        All right.  Counsel, I suggest you might want to talk with your client about that.  We'll go forward.  I'll let you talk with your client first.
(Trial Tr. Vol. I at 36.)  Defense counsel then conferred with Barbour who apparently was speaking loudly in response.  Counsel reported at another sidebar that Barbour was denying the gesture and was upset by the suggestion made by Marr.  (Id. at 37.)  In the meantime it became clear that the attending United States Marshal wished to discuss the matter with the court.  (Id.)  There was agreement to defer the matter until after the Ross testimony.  (Id. at 37-38.)  The matter was discussed at some length after Ross finished his testimony.  (Id. at 65-71.)

(Id. at 327-28.)

As to the obstruction of justice adjustment, this Court ruled:

I do find obstruction under 3C1.1.
That guideline provides that if a defendant willfully obstructed or impeded or attempted to obstruct or impede the administration of justice during the course of the prosecution …or sentencing, and related to the offense of conviction and any relevant conduct, increase the offense level by two levels.
The commentary goes on to give a non exhaustive list of examples to which it does apply and to which is doesn't apply, and within the list of examples to which it does apply is threatening, intimidating, or otherwise unlawfully influencing a codefendant, witness, directly or indirectly or attempting to do so.
The record is abundantly clear here both in the … letters that are a matter of record, and the testimony from witnesses about the attempts that Mr. Barbour made to change testimony, to prevent testimony, threats, intimidation, all of those.  So two levels are added.

(Id. at 346.)

Vis-à-vis Barbour's challenge to the obstruction of justice on direct appeal, the First Circuit stated: "A lengthy discussion of Barbour's challenge to the obstruction of justice enhancement is not necessary. The record is replete with references to support the district court's conclusion."  Barbour, 393 F.3d at 93.

In his amended 28 U.S.C. § 2255 memorandum Barbour states that the question is not whether or not the enhancement was appropriate, but whether or not he was denied fair notice of the enhancement in view of the fact that neither the pre-sentence investigation report nor the Government's sentencing memorandum recommended the enhancement.  (Am. Sec. 2255 Mem. at 50.)  If this lack of notice deprived him of due process, Barbour opines, then counsel was ineffective for not objecting on this ground.

(Id.)   Barbour complains that the Government based its request for an obstruction enhancement on May's testimony at sentencing but the Court, Barbour urges,  based its

decision not only on May's sentencing testimony but on the letters in the record and,

perhaps, the testimony of other witnesses.  (Id. at 50-51.)   The Court's reliance on this

evidence,

> further solidifies Barbour's fair notice due process claim.  Moreover, had
> counsel received fair notice, he could have shown that no testimony
> revealed an attempt by Barbour to obstruct justice, and that the letters
> similarly contained no such attempt, but rather, were merely lawful
> communications that, while perhaps offensive to the Government, embody
> speech protected by the  First Amendment to the Federal Constitution.

(Id. at 51.)

So, Barbour now puts a lack-of-notice/ineffective assistance bent on his complaint

about the obstruction adjustment.   The problem is that the First Circuit's United States v.

Canada, 960 F.2d 263 (1st Cir. 1992) counsels that the guidelines provide adequate notice

to the defendants of the possible grounds for an adjustment, even if the pre-sentence

investigation report does not raise the issue.  Distinguishing its case from Burns v. United

States, 501 U.S. 129 (1991) which involved an upward departure the Canada Panel

explained: "We do not read Burns to require special notice where, as here, a court decides

that an upward adjustment is warranted based on offense or offender characteristics

delineated within the Sentencing Guidelines themselves, at least where the facts relevant

to the adjustment are already known to defendant."  960 F.2d at 266.  Compare United

States v. Walker, 234 F.3d 780(1st Cir. 2000).  Sentencing counsel did not perform

deficiently in not objecting to the obstruction enhancement on a lack of fair notice basis.

### Sentencing Counsel's Failure to Question Barbour on the Issue of whether  he had Waived Counsel on his Prior Convictions and Regarding whether Barbour Received a Proper Colloquy on his Counseled Convictions (Count XII)

In his twelfth 28 U.S.C. § 2255 ground Barbour asserts that he told sentencing

counsel that he wanted to pursue a challenge to his prior state convictions that were used

to calculate his criminal history category.  (Am. Sec. 2255 Mem. at 51.)  He states that he

told counsel that as to his un-counseled convictions he was not informed of his right to

counsel or his right to confront the witnesses against him and he also alleges that he told

counsel that as to his counseled convictions he was not informed that he had the right to

confront and cross-examine the witnesses against him.   (Id. at 51-52; Barbour Aff. at 7.)

According to Barbour he instructed counsel to call him to the witness stand at the

sentencing hearing to testify as to these constitutional infirmities and counsel agreed to

do this yet never followed through.  (Am. Sec. 2255 Mem. at 52; Barbour Aff. at 7.)

Barbour asserts that, had counsel followed through, the burden would have shifted to the

government and the government would have been unable to shoulder this burden and

Barbour's history would have been 2 rather than 5.  (Am. Sec. 2255 Mem. at 52.)

     The First Circuit reviewed Barbour's claim concerning his prior conviction and

concluded:

> Barbour argues that the district court sentenced him from the
> wrong criminal history category because the government failed to
> establish that he was represented by counsel for his previous convictions.
>     Once the government establishes the existence of a prior
> conviction, the burden shifts to the defendant to show that the earlier
> conviction was constitutionally infirm or otherwise inappropriate for
> consideration. United States v. Gray, 177 F.3d 86, 89 (1st Cir.1999). For
> his lack of representation claim, Barbour must have established both that
> he was uncounseled and that he did not waive his right to counsel. Id. at
> 90. The Presentence Investigation Report, which can be used to satisfy the
> government's "modest" burden, id. at 89, detailed fifteen of Barbour's prior
> convictions. Barbour provided state records of his criminal history; some
> of those records indicate that Barbour was represented and some of them
> are silent as to representation.
>     Even if we were to assume those records establish a lack of
> representation, they still do not show whether Barbour waived his right to
> counsel. Id. We have said that as the person in the best position to offer
> details about his own criminal history, a defendant's silence at sentencing
> can be "deafening." Id. at 90. Here, Barbour testified at sentencing, but
> failed to testify about whether he was represented in connection with his

prior convictions, thus failing to establish the necessary element of failure
to waive counsel. The district court did not err in its criminal history
determination.

Barbour, 393 F.3d at 93.

Other than his bald assertion that he asked his attorney to question him on the
underpinnings of his prior convictions, Barbour has provided no tangible evidence to
support his underlying contention that there were infirmities in these convictions used to
establish his criminal history category.  Furthermore, the United States notes that Barbour
had fifteen prior convictions, only five of which were used towards his criminal history
score.  (Gov't Mot. Summ. Dismissal at 21.)

### Failure of Appellate Counsel to Properly Argue Barbour's Blakely/Booker Claim (Ground XIII)

Barbour notes as to his thirteenth ground that the parties were invited to
simultaneously brief the United States v. Booker, 543 U.S. 220 (2005) issues by the First
Circuit Court of Appeals (after oral argument).  (Am. Sec. 2255 Mem. at 52.)  It is
Barbour's 28 U.S.C. § 2255 position that retroactively applying the Booker remedy was
impermissible and he had a vested right to a pre-Booker sentence.  (Id. at 52-53.)
Barbour presses that Booker should only be applied retroactively to cases when applying
Booker did not impair the rights of the defendants, increase the defendant's liability, or
impose new duties with respect to already completed transactions.  (Id. at 53.)  Under
Blakely, Barbour believes, he was entitled to a "jury determination of all sentence-driving
facts."  (Id.)  The application of Booker to his sentencing, he reasons, violates the ex post
facto clause of the United States Constitution.  (Id. at 53-54.)   He goes on to argue that
the Supreme Court's Booker was "an act of judicial legislation unprecedented in scope
and magnitude."  (Id. at 56.)

Barbour's direct appeal was decided on December 29, 2004.  Booker was decided on January 12, 2005.  On January 14, 2005, Barbour's appellate counsel filed a petition for rehearing and rehearing en banc.  On February 11, 2004, Barbour's attorney filed a motion for remand or, in the alternative, for leave to file a supplemental brief.  On February 16, 2005, the First Circuit invited supplemental briefs on the Booker concern, asking whether any Booker error "caused prejudice that affected the defendant's substantial rights."  On April 8, 2005, the First Circuit concluded that there was no basis for rehearing or rehearing en banc.  Quite simply Booker was not applied retroactively to Barbour's case.

### Appellate Counsel's Failure to Argue that there was Insufficient Evidence to Support his Cocaine Conspiracy Conviction (Ground XIV)

Barbour faults appellate counsel for not making an insufficiency of the evidence argument.  This is his fourteenth ground.  He asserts that by the terms of the indictment the Government needed "to prove that Barbour and May knowingly, willfully, and intentionally conspired together to distribute and to possess with intent to distribute cocaine." (Am. Sec. 2255 Mem. at 56- 57.)  "There is not one shred of evidence," Barbour insists, "that May and Barbour conspired to do anything except sell marijuana." (Id. at 57.)  Barbour believes that had appellate counsel raised this claim on direct appeal the First Circuit necessarily would have concluded that no reasonable jury could have found beyond a reasonable doubt that Barbour and May "conspired to peddle cocaine." (Id.)

With respect to May's participation in the cocaine-related doings of the conspiracy, the First Circuit has affirmed this Court's attribution of cocaine to May at his sentencing, see United States v. May, 343 F.3d 1, 6 -7 (1st Cir. 2003), after May pled

43

guilty to the marijuana count.   And, contrary to Barbour's view of the case, it was not necessary for the United States to demonstrate that Barbour conspired with May to prove the cocaine conspiracy count.  The indictment, while a joint indictment of May and Barbour,  reads that Barbour conspired with others, known and unknown.  (Crim. No. 01-92-P-H,  Docket No. 4.)  The evidence at trial was that Barbour was involved with several individuals in regards to the cocaine.  The First Circuit Court of Appeals observed that the evidence of Barbour's guilt was strong.  Barbour, 393 F.2d at 91.  To build an insufficiency of the evidence argument into the appellate brief may have been possible, but it would have been an unwise use of limited space.  Foregoing the argument in face of the jury verdict (delivered after two hours of deliberation) certainly is not reproachable under Strickland.

### Barbour's Contention that he is Actually, Factually, and Legally Innocent of the Cocaine Conspiracy Count (Count XV)

With respect to his final count Barbour states only: "The argument is in the Ground and the proof is in the record and in this pleading."  (Am. Sec. 2255 Mem. at 58.)  In his reply brief Barbour explicates:

> [W]hat would the jury have done if they were told (1) that AUSA Toof told May to answer "yes" to all questions asked about Barbour; (2) that it was Pat Cambron who called May the night before the initial Kilogram arrived in Maine, and that Case had told May that he (Case) and Cambron were working together on their own distributing cocaine; (3) that contrary to AUSA Toof's repeated suggestion to the jury, May had not retreated from statements made to agents in Barbour's absence; (4) that Hall had left Barbour's marijuana organization, and in fact had left town altogether, long before any cocaine arrived in Maine; (5) that Case and Kevin Woodward had plotted in the county jail about how to "play up" Barbour's role, a term which, under any conceivable definition, involves dishonesty; (6) that Case had been involved in cocaine trafficking for most of his adult life, and continued to be so involved long after parting company with Barbour; (7) that Case was so determined to stay out of jail that in an effort to avoid law enforcement, he crashed a snowmobile through a barn

door and sped off into the night spilling cocaine and a gun in the process; (8) that because a Kilogram contains 35.2 ounces, and not 35.7 ounces as Agent Baril stated in his testimony, Case's statement that he saw 35 ounces at May's house, and that one ounce was missing from the Kilo, could not possibly be true and thus Case's statement that May had told him that Barbour had told May that he (Barbour) had skimmed some of the cocaine likewise could not have been true; and (9) that Barbour was not contesting that he sold marijuana, only that he sold cocaine, and the amount of marijuana he sold (Barbour wholly owns this mistake).  What would the jury's verdict have been had they known these things?

(Reply Mem. at 19-20.)

"Merely to claim that new evidence casts doubt, even grave doubt, on the correctness of a conviction is not a ground for relief on collateral attack." Conley v. United States, 323 F.3d 7, 14 (1st Cir. 2003) (citing Herrera v. Collins, 506 U.S. 390, 400 (1993) and United States v. Evans, 224 F.3d 670, 673-74 (7th Cir.2000)).  "At best, the newly-discovered evidence, adding everything together, simply increases--how much is debatable--the likelihood that at a new trial a jury might find reasonable doubt of guilt and so acquit." Id. at 14 n.16.  To the extent that the May affidavit is meant to buffer Barbour's fifteenth ground, I would be hard pressed to conclude that, given May's prior testimony, it would increase the likelihood that at a new trial a jury might find reasonable doubt of guilt and so acquit.

### Conclusion

For the reasons set forth above, I recommend that the Court **DENY** Barbour 28 U.S.C. § 2255 relief.

<u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum,

within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

May 30, 2007

/s/Margaret J. Kravchuk
U.S. Magistrate Judge